## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **JOHN DUMAS, individually and on behalf of all others similarly situated,**<br><br>          ***Plaintiff,***<br><br>**v.**<br><br>**JERICO PICTURES, INC., d/b/a NATIONAL PUBLIC DATA**<br><br>          ***Defendant.*** | Case No.: <u>0:24-cv-61502</u><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff John Dumas, ("Plaintiff") brings this Class Action Complaint against Defendant Jerico Pictures, Inc., d/b/a National Public Data ("Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## STATEMENT OF FACTS

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the personally identifiable information ("PII") of roughly 2 billion people, including, but not limited to: full name, date of birth, address, phone number, Social Security Number, and other information regarding relatives.

2.      Using the above personal information, it is possible to identify an individual's parents, nearest siblings, uncles, aunts, cousins, and deceased relatives—including individuals who have been deceased for nearly twenty years.[1]

3.      Upon information and belief, Defendant collects and sells access to personal data for use in background checks, private investigations, mobile applications, and by data resellers.[2] The data Defendant collects is scraped from public and/or non-public sources, without the data subject's knowledge or consent, and is compiled into individual profiles. A major problem with this practice is that Defendant has no ties with the data subjects, so most of them will have no idea that their data has been disclosed without their authorization.

4.      In, or around, April 2024, a cybercriminal called "USDoD" claimed to have access to almost 2.7 billion records of personal information that was obtained from National Public Data databases and subsequently leaked the data on a hacking forum (hereafter referred to as the "Data Breach"). "Since then, various threat actors have released partial copies of the data, with each leak sharing a different number of records and, in some cases, different data."[3]



*Image from a threat actor known as "Fenice" leaking the National Public Data on a hacking forum*

---

[1] https://x.com/vxunderground/status/1797047998481854512?s=46
[2] https://www.nationalpublicdata.com/
[3] https://www.bleepingcomputer.com/news/security/hackers-leak-27-billion-data-records-with-social-security-numbers/

5.      "The value of the National Public Data records from a criminal's perspective comes from the fact that they have been collected and organized. While the information is largely already available to attackers, they would have had to go to great lengths at great expense to put together a similar collection of data, so essentially [National Public Data] just did them a favor by making it easier." Furthermore, since the data set contains records regarding deceased persons, criminals can use the data "to create birth certificates, voting certificates, etc., that will be valid."[4]

6.      To date, Defendant has failed to send data breach notice letters to individuals who were affected by the Data Breach discussing the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. These details have not been explained or clarified to Plaintiff, who retains a vested interest in ensuring that their PII remains protected.

7.      Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

8.      The Data Breach was a direct result of Defendant's failure to implement reasonable safeguards to protect PII from a foreseeable and preventable risk of unauthorized disclosure. Had Defendant implemented administrative, technical, and physical controls consistent with industry standards and best practices, it could have prevented the Data Breach.

9.      Defendant's conduct resulted in the unauthorized disclosure of Plaintiff's private information to cybercriminals. The unauthorized disclosure of Plaintiff's PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendant's failure to

---

[4] https://www.techrepublic.com/article/social-security-numbers-leak/

adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiff.

10.     More specifically, Defendant is a data aggregator that collects and sells personal data that it gathers from various data broker websites. As a result of Defendant's failure to protect Plaintiff's PII, Plaintiff is now required to spend time and money finding and removing data from data broker websites. The data removal process involves:

- Scanning data broker websites to find records.[5]
- Performing "opt-outs" on each data broker website.
- Confirming the data removal request by email.
- Submitting completed PDF forms.
- Receiving confirmation codes and submitting them to the data broker websites.
- Continued scanning of the data broker websites to confirm removal of PII.
- Regularly scheduling monitoring of all data broker websites to detect reappearing records.

11.     The cost to automate this "opt-out" process is $355.32 a year or $32.90 per month.[6] The necessary time and/or money spent finding and removing data from data broker websites is an actual, particularized, and concrete harm, traceable to the Defendant's failure to adequately secure the PII in its custody. The harms suffered, as described herein, can be redressed by a decision awarding Plaintiff and Class Members monetary damages in this matter.

12.     Defendant has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendant has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

---

[5] A list of the numerous data broker websites can be found here: https://privacyrights.org/data-brokers
[6] The annual plan reflects a 10% discount. *See,* IDX, Individual Consumer Plans, https://www.idx.us/privacy-identity-protection/consumer-plans (last access August 13, 2024).

13.     Defendant's conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The circumstances demonstrating a substantial risk of future exploitation include, but are not limited to:

- **Sensitive Data Type**: The data acquired in the Data Breach included unencrypted social security numbers, dates of birth, full names, addresses, and phone numbers. Upon information and belief, this category of data is used by cybercriminals to perpetuate fraud, identity theft, and other forms of exploitation.[7]

- **Data Breach Type**: USDoD, the cybercriminal initially posting the stolen data for sale has a history of using information stealing trojans like RedLine. "Info-stealers like RedLine typically are deployed via email malware campaigns, and by secretly bundling the trojans with cracked versions of popular software titles made available online. Credentials stolen by info-stealers often end up for sale on cybercrime shops that peddle purloined passwords and authentication cookies."[8]

- **Data Misuse**: Upon information and belief, USDoD obtained the database from another threat actor using the alias "SXUL." Since April 2024, various threat actors have released partial copies of the data acquired in the Data Breach on the dark web.[9] The dark web uses a series of encrypted networks to hide users' identities, which makes it convenient for criminals to buy and sell illegally obtained data. Many criminals purchase stolen personal data off the dark web before launching social engineering-based attacks. A social engineering attack is a method of using psychological manipulation to deceive a victim and gain access to a computer system or to steal sensitive information such as login credentials. Social engineering attacks that can be launched using names, telephone numbers and email addresses include phishing, smishing (SMS message), vishing (voice messaging), pretexting, and baiting attacks.

14.     The imminent risk of future harm resulting from the Data Breach is traceable to the Defendant's failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiff.

---

[7] https://www.f-secure.com/us-en/articles/why-do-hackers-want-your-personal-information
[8] https://krebsonsecurity.com/2023/09/fbi-hacker-dropped-stolen-airbus-data-on-9-11/
[9] https://www.bleepingcomputer.com/news/security/hackers-leak-27-billion-data-records-with-social-security-numbers/

15.     More specifically, the Plaintiff's exposure to the substantial risk of future exploitation caused them to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach or removing their data from data broker websites; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiff's suffered can be redressed by a favorable decision in this matter.

16.     Plaintiff faces a substantial risk of future spam, phishing, or other social engineering attacks where their full names, addresses, and phone numbers were stolen by a cybercriminal, known for stealing and reselling personal data on the dark web. Names, telephone numbers and email addresses can be used by cybercriminals to launch social engineering attacks designed to trick individuals into giving away sensitive information. Plaintiff has incurred out of pocket costs for purchasing products to protect from phishing, smishing (SMS message), vishing (voice messaging), pretexting, and other social engineering-based attacks.

17.     Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiff's information to obtain government benefits, file fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

18.     As a result of the Data Breach, Plaintiff suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii)

statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data.

19.     Defendant, as a data collector and/or data aggregator, was obligated to use reasonable technical, administrative, and physical safeguards to protect the PII in its possession.

20.     Plaintiff was unaware that Defendant was collecting, aggregating, and selling PII and thus relied on this sophisticated business entity to keep their PII confidential and securely maintained.

21.     Plaintiff and Class Members (later defined) were impacted by the Data Breach. Plaintiff brings this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendant's inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

22.     Through this Complaint, Plaintiff seeks to remedy these harms individually, and on behalf of all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiff has a continuing interest in ensuring that personal information is kept confidential and protected from disclosure, and Plaintiff should be entitled to injunctive and other equitable relief.

***Data Breaches Are Avoidable***

23.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

24.     Upon information and belief, the Data Breach was a direct result of Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) implement reasonable data protection measures for the collection, use, disclosure, and storage of personal information; and/or (iii) ensure its third-party vendors were required to implement reasonable data protection measures.

25.     Upon information and belief, the Data Breach occurred as the result of a ransomware attack. In a ransomware attack, the attackers use software to encrypt data on a compromised network, rendering it unusable and then demand payment to restore control over the network.[10] Ransomware groups frequently implement a double extortion tactic, "where the cybercriminal posts portions of the data to increase their leverage and force the victim to pay the ransom, and then sells the stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[11]

26.     Upon information and belief, the Data Breach occurred as a result of a phishing attack. A phishing attack involves the use of fraudulent emails, social media messages, text messages, websites, or other communication to trick people into revealing login credentials or other sensitive information. Phishing attacks are prevalent because they exploit human vulnerabilities. Cybercriminals can use phishing attacks to "trick people who have authorized access to their target—be it money, sensitive information or something else—into doing their dirty work."[12]

27.     To detect and prevent cyber-attacks, Defendant could and should have implemented the following measures:

---

[10] *Ransomware FAQs*, https://www.cisa.gov/stopransomware/ransomware-faqs
[11] *Ransomware:    The    Data    Exfiltration    and    Double    Extortion    Trends*, https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends
[12] *What is phishing?* IBM security topics, https://www.ibm.com/topics/phishing (accessed August 14, 2024).

Reasonable Safeguards

a.  Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

b.  Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

c.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

d.  Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

e.  Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

f.  Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

g.  Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

h.  Configure firewalls to block access to known malicious IP addresses.

i.  Set anti-virus and anti-malware programs to conduct regular scans automatically.

j.  Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

k.  Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

l.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

m.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

n.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

o.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

p.   Execute operating system environments or specific programs in a virtualized environment.

q.   Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

r.   Conduct an annual penetration test and vulnerability assessment.

s.   Secure your backups.[13]

t.   Identify the computers or servers where sensitive personal information is stored.

u.   Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

v.   Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

w.   Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

x.   Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

y.   Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

z.   To detect network breaches when they occur, consider using an intrusion detection system.

aa.  Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

bb.  Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

cc.  Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

---

[13] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

dd. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[14]

28.     Given that Defendant collected, used, and stored PII, Defendant could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

29.     Without identifying the potential risks to the personal data in Defendant's possession, Defendant could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiff's and the Class Members' PII.

30.     Defendant knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiff and the Class Members as a result.

***Plaintiff and Class Members Sustained Damages in the Data Breach***

31.     The invasion of the Plaintiff's and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a consequence of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

32.     As a result of Defendant's failure to protect Plaintiff's PII, Plaintiff is now required to spend time and money finding and removing data from data broker websites. Notably, the

---

[14] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

database of information involved in the Data Breach does not contain information from individuals who previously used data opt-out services.[15]

33.     Additionally, Plaintiff and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their names, social security numbers, and dates of birth were targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

34.     Furthermore, Plaintiff and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime, where their names and contact information were acquired in the Data Breach and subsequently released on the dark web. The substantial risk of future exploitation created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

35.     Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[16] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

---

[15] *See,* https://x.com/vxunderground/status/1797047998481854512?s=46

[16] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

36.     Given the type of targeted attack in this case, the sophistication of the criminal posting about the data acquired in the Data Breach, the type of PII involved in the Data Breach, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed on the dark web, it is reasonable for Plaintiff and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the PII for future identity theft-related crimes or exploitation attempts.

37.     The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach, including opting-out of data broker websites.

38.     For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[17]

---

[17]*See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

39.     As a consequence of the Data Breach, Plaintiff and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year. As mentioned above, the cost to automate the "opt-out" process is between $355.32 and $394.80 a year to have data removed from data broker websites.

40.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

41.     Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[18] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[19] Sensitive PII can sell for as much as $363 per record.[20]

42.     Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. By collecting Plaintiff's and Class Members' PII, using

---

[18]     *Column: Shadowy data brokers make the most of their invisibility cloak,* https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[19] *In the Dark,* VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[20] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

their PII for profit or to improve the ability to make profits, and then permitting the unauthorized disclosure of the PII, Plaintiff and Class Members were deprived of the benefit of their bargain.

43.     By selling products or services that disclosed Plaintiff and Class Members PII, Defendant undertook a duty to protect their personal data. However, Defendant did not invest the funds into implementing reasonable data security practices.

44.     Through this Complaint, Plaintiff seeks redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

## JURISDICTION & VENUE

45.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from each Defendant.

46.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District.

47.     Venue is proper under 28 U.S.C §1391(b) because Defendant maintains a principal place of business in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## PARTIES

48.     Plaintiff John Dumas is a citizen of the State of Nevada. At all relevant times, Plaintiff has been a resident of Las Vegas, Clark County, Nevada.

49.     Defendant Jerico Pictures Incorporated, d/b/a National Public Data is a Florida corporation with its principal place of business at 1801 N.W. 126th Way, Coral Springs, Broward

County, Florida 33071. Defendant's registered agent for service of process is Salvatore Verini Jr.,

1801 N.W. 126th Way, Coral Springs, Broward County, Florida 33071.

## CLASS ALLEGATIONS

50.     Plaintiff brings this nationwide class action individually, and on behalf of all

similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal

Rules of Civil Procedure.

51.     The Classes that Plaintiff seeks to represent is defined as follows:

**Nationwide Class**
All individuals residing in the United States whose PII was accessed and acquired by an
unauthorized party as a result of the Data Breach that occurred in, or around, April 2024
(the "Class").

**Dark Web Monitoring Subclass**
All individuals residing in the United States who were notified by a dark web monitoring
and identity protection service that their PII was accessed and acquired by an unauthorized
party as a result of National Public Data's, Data Breach that occurred in, or around, April
2024 (the "Dark Web Monitoring Subclass").

**Nevada Subclass**
All individuals residing in Nevada whose PII was accessed and acquired by an
unauthorized party as a result of the Data Breach that occurred in, or around, April 2024
(the "Nevada Subclass").

52.     Collectively, the Class, Dark Web Monitoring Subclass, and Nevada Subclass are

referred to as the "Classes" or "Class Members."

53.     Excluded from the Classes are the following individuals and/or entities: Defendant

and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which

Defendant has a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; and all judges assigned to hear any

aspect of this litigation, as well as their immediate family members.

54.     Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

55.     <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. The members of the Classes are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and such number is exclusively in the possession of Defendant, upon information and belief, 2.9 billion individuals were impacted in Data Breach.

56.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

    a.  Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

    b.  Whether Defendant had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

    c.  Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

    d.  Whether Defendant required its third-party vendors to adequately safeguard the PII of Plaintiff and Class Members;

    e.  When Defendant actually learned of the Data Breach;

    f.  Whether Defendant had a duty to adequately, promptly, and accurately inform Plaintiff and Class Members that their PII had been compromised;

    g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

    h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    i.  Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

17

j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

57.   <u>Typicality</u>: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

58.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

59.   <u>Adequacy</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

60.   <u>Superiority and Manageability</u>: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

61.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

62.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

63.     Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

64.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Classes, Defendant may continue to refuse to provide proper notification

to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

65.     Further, Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

66.     Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant failed to timely notify the Plaintiff and the Classes of the Data Breach;

    b.   Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, sharing, storing, and safeguarding their PII;

    c.   Whether Defendant's (or their vendors') security measures to protect its network were reasonable in light of industry best practices;

    d.   Whether Defendant's (or their vendors') failure to institute adequate data protection measures amounted to negligence;

    e.   Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII;

    f.   Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and

    g.   Whether adherence to FTC recommendations and best practices for protecting personal information would have reasonably prevented the Data Breach.

## CAUSES OF ACTION
### (*On behalf of Plaintiff and the Classes*)

### COUNT 1: NEGLIGENCE/NEGLIGENCE *PER SE*

67.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

68.     Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to customers. Plaintiff and Class Members were unaware that Defendant was collecting and reselling their PII.

69.     Defendant had full knowledge of the types of PII it collected and the types of harm that Plaintiff and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

70.     By collecting, storing, sharing, and using the Plaintiff's and Class Members' PII for commercial gain, Defendant assumed a duty to use reasonable means to safeguard the personal data it obtained.

71.     Defendant's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to implement reasonable administrative, technical, and physical measures to protect the PII from unauthorized disclosure; (iii) complied with applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant's and/or its vendors' data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

72.     Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce.

73.     Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII that Defendant was no longer required to retain.

74.     Defendant had a duty to notify Plaintiff and the Classes of the Data Breach promptly and adequately. Such notice was necessary to allow Plaintiff and the Classes to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

75.     Defendant violated Section 5 of the FTC Act, and other state consumer protection statutes by failing to use reasonable measures to protect PII. Defendant's violations of Section 5 of the FTC Act, and other state consumer protection statutes, constitutes negligence *per se.*

76.     Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant includes, but are not limited to, the following:

    a.  Failing to implement organizational controls, including a patch management policy to track and manage updates and patches for known vulnerabilities.

    b.  Failing to have defined periods when patches must be installed and/or an automated means of determining what patches are needed, where they are needed, and the status of current patch levels by location.

    c.  Failing to encrypt personally identifying information in transit and at rest.

    d.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

    e.  Failing to adequately monitor the security of their networks and systems.

    f.  Allowing unauthorized access to PII.

    g.  Failing to detect in a timely manner that PII had been compromised.

    h.  Failing to remove former customers' PII it was no longer required to retain.

    i.  Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

    j.  Failing to implement data security practices consistent with industry best practices.

77.     Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

78.     The injuries resulting to Plaintiff and the Classes because of Defendant's failure to use adequate security measures was reasonably foreseeable.

79.     Plaintiff and the Classes were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

80.     Plaintiff and the Classes had no ability to protect the PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiff and the Classes as a result of the Data Breach.

81.     But for Defendant's breach of duties owed to Plaintiff and the Classes, their PII would not have been compromised. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the PII of Plaintiff and the Classes and the harm, or risk of imminent harm, suffered by Plaintiff and the Classes.

82.     As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

83.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

84.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

**COUNT 2: UNJUST ENRICHMENT**

85.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

86.     By obtaining and reselling Plaintiff's and Class Members' PII, Defendant received a monetary benefit. Defendant knew that it could sell the PII for financial gain and has retained that benefit.

87.     By collecting the PII, Defendant was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been compromised or stolen.

88.     Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, it would be unjust for Defendant to retain any of the benefits that it received without paying Plaintiff and Class Members value in return.

89.     As a direct and proximate result of the Defendant's conduct, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where:

(a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

90.     Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## COUNT 3: INVASION OF PRIVACY

91.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

92.     Plaintiff and Class Members had a legitimate expectation of privacy in their personally identifying information such as their social security numbers and dates of birth. Plaintiff and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

93.     Defendant owed a duty to Plaintiff and Class Members to keep their PII confidential.

94.     Defendant permitted the public disclosure of Plaintiff's and Class Members' PII to unauthorized third parties.

95.     The PII that was disclosed without the Plaintiff's and Class Members' authorization was highly sensitive, private, and confidential. The public disclosure of the type of PII at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

96.     Defendant permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur.

Despite knowledge of the substantial risk of harm created by these conditions, Defendant intentionally disregarded the risk, thus permitting the Data Breach to occur.

97.     By permitting the unauthorized disclosure, Defendant acted with reckless disregard for the Plaintiff's and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the PII at issue was not newsworthy or of any service to the public interest.

98.      Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiff's and Class Members' data.

99.     Defendant acted with such reckless disregard as to the safety of Plaintiff's and Class Members' PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiff and Class Members.

100.    Plaintiff and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

### COUNT 4: VIOLATION OF NEVADA'S SECURITY AND PRIVACY OF PERSONAL INFORMATION ACT
### {NRS §§603A.010 et seq.}

101.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

102.    Defendant is a business entity that handles, collects, disseminates, or otherwise deals with nonpublic personal information.

103.    In, or around, April 2024, Defendant experienced a breach of its security systems that resulted in the unauthorized acquisition of computerized data that materially compromises the security, confidentiality or integrity of personal information maintained by the Defendant.

104.    The personal information accessed in the Data Breach includes full names, dates of birth, addresses, phone numbers, and unencrypted, non-truncated, Social Security Numbers.

105.    Defendant maintains records which contain the personal information of Plaintiff and other Nevada residents. As such, Defendant had a duty to implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

106.    Furthermore, Defendant had a duty to disclose any breach of the security of the system data and notify Plaintiff and Class Members of the breach once it determined their unencrypted personal information was, or was reasonably believed to have been, acquired by an unauthorized person.

107.    Defendant violated Nevada's Security and Privacy of Personal Information Act ("NSPPI") by failing to use reasonable measures to protect the PII in its possession. Defendant's violations of the NSPPI constitutes negligence.

108.    Defendant breached its duties under the NSPPI, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant includes, but are not limited to, the following:

k.    Failing to implement organizational controls, including a patch management policy to track and manage updates and patches for known vulnerabilities.

l.    Failing to have defined periods when patches must be installed and/or an automated means of determining what patches are needed, where they are needed, and the status of current patch levels by location.

m.    Failing to encrypt personally identifying information in transit and at rest.

n.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

o.    Failing to adequately monitor the security of their networks and systems.

p.    Allowing unauthorized access to PII.

q.    Failing to detect in a timely manner that PII had been compromised.

    r.   Failing to remove outdated PII it was no longer required to retain.

    s.   Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

    t.   Failing to implement data security practices consistent with industry best practices.

109.    Plaintiff and Class Members were within the class of persons the NSPPI was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

110.    The injuries resulting to Plaintiff and the Classes because of Defendant's failure to use adequate security measures was reasonably foreseeable.

111.    Plaintiff and the Classes were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

112.    Plaintiff and the Classes had no ability to protect the PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiff and the Classes as a result of the Data Breach.

113.    But for Defendant's breach of duties owed to Plaintiff and the Classes, their PII would not have been compromised. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the PII of Plaintiff and the Classes and the harm, or risk of imminent harm, suffered by Plaintiff and the Classes.

114.    As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual

consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

115.    Plaintiff and Class Members are entitled to compensatory and consequential damages in an amount to be determined at trial.

**COUNT 5: VIOLATION OF NEVADA'S DECEPTIVE TRADE PRACTICES ACT**

116.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

117.    Defendant collects personal information regarding the Plaintiff and Class Members in the ordinary course of providing products or services.

118.    Defendant gathered and stored the PII of Plaintiff and Class Members, without their knowledge or consent, as part of its business. Plaintiff and Class Members were thus reliant upon Defendant to adequately safeguard their information.

119.    Defendant had a duty to implement and maintain reasonable security measures to protect the Plaintiff's and Class Members' PII from unauthorized access, acquisition, destruction, use, modification, or disclosure. Defendant also had a duty to notify Plaintiff and Class Members of the Data Breach.

120.    Defendant's failure to implement and maintain reasonable security measures and notify Plaintiff of the Data Breach constitutes a deceptive trade practice under Nevada's Deceptive Trade Practices Act. *See* NRS §603A.260.

121.    Plaintiff is a person who is 60 years of age or older and is statutorily defined as an "elderly person." NRS §598.0933. Defendant's conduct caused Plaintiff and Class Members to suffer economic damage or otherwise interfered with the economic well-being of elderly persons.

122.    Defendant collected and sold sensitive personal data, but allowed unauthorized access to this personal information; Defendant failed to disclose material facts that the Plaintiff's and Class Members' PII would be disclosed to unauthorized third parties; Defendant failed to obtain Plaintiff's and Class Members' consent in collecting and transmitting their PII to a third party; and knowingly violated industry and legal standards regarding the protection of Plaintiff's and Class Members' PII.

123.    Defendant's deceptive acts affected public interests, including those of Plaintiff and Class Members. Defendant knew or should have known that it was likely to mislead its customers who were acting reasonably. Defendant engaged in unfair or deceptive practices by breaching its duties to provide technical and organizational data security policies, procedures, and practices. Defendant's failures are offensive to established public policy and is substantially injurious to consumers as evidenced by the massive Data Breach.

124.    Defendant's deceptive acts, as described herein, proximately caused Plaintiff and Class Members damages. As a direct and proximate result of the Defendant's conduct, Plaintiff and Class Members suffered damages including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) mitigation costs and expenses; and (vii) attorneys' fees and court costs.

125.    Plaintiff alleges that Defendant's data security measures remain inadequate.

Plaintiff will continue to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

126.    Plaintiff and Class Members have suffered irreparable injury, and will continue to suffer injury in the future, as a result of Defendant's deceptive trade practices, which places Plaintiff and Class Members at imminent risk that further compromises of their PII will occur in the future. As such, the remedies available at law are inadequate to compensate for that injury. Accordingly, Plaintiff and Class Members also seek to obtain a judgment declaring, among other things, the following:

> u.  Defendant continues to owe a legal duty to secure PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes.

> v.  Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff and Class Members' PII.

127.    The Court also should issue corresponding prospective injunctive relief requiring that Defendant employs adequate data protection practices consistent with law and industry standards.

128.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiff will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

129.    The issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendant to take necessary action to prevent another data breach, thus eliminating the additional injuries

that would result to Plaintiff and the multitude of individuals whose PII would be at risk of future unauthorized disclosures.

130.    As a result of the Defendant's false, misleading, or deceptive acts, regarding its data security practices, the consuming public in general, Plaintiff, and Class Members suffered injuries including, but not limited to, the future and continued risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

131.    Plaintiff and Class Members are entitled to attorneys' fees, costs, and injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) implement strong authentication mechanisms for accessing cloud services; and (iii) to provide adequate dark web monitoring and/or credit monitoring to all affected by the Data Breach.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Classes and counsel for Plaintiff(s) as Class Counsel;

B.    For an order declaring the Defendant's conduct violates the statues and causes of action referenced herein;

C.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

D.    Ordering Defendant to pay for lifetime credit monitoring and dark web scanning services for Plaintiff and the Classes;

E.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F.    For prejudgment interest on all amounts awarded;

G.    For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendant's conduct;

H.    For injunctive relief as pleaded or as the Court may deem proper; and

I.    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J.    Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: August 16, 2024

*/s/ Bryan F. Aylstock*
Bryan F. Aylstock, FL Bar # 78263
D. Nicole Guntner, FL Bar # 1028925
**AYLSTOCK, WITKIN, KREIS &**
    **OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email:  baylstock@awkolaw.com
            nguntner@awkolaw.com

and

Paul J. Doolittle, Esq.*
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
            cmad@poulinwilley.com
*Pro Hac Vice forthcoming*

*Attorneys for Plaintiff*